**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARSH & MCLENNAN AGENCY, LLC,<br><br>Plaintiff,<br><br>v.<br><br>STEVE CHRISTENSON and HEIDI HAGEMEYER,<br><br>Defendants. | Civil Action No. |

## **COMPLAINT**

Plaintiff Marsh & McLennan Agency, LLC ("Plaintiff" or "MMA"), by and through its undersigned counsel, files this Complaint against Defendants Steve Christenson ("Christenson") and Heidi Hagemeyer ("Hagemeyer") (collectively, "Defendants" or "Former Employees"), and states and alleges as follows:

## **INTRODUCTION**

1.     This action involves claims by MMA against the Defendants arising out of their increasingly blatant disregard of their contractual and other legal obligations to MMA. Christenson's deliberate and wrongful solicitation of MMA employees—and Defendants' coordinated solicitation and servicing of MMA clients—poses an immediate and substantial threat to MMA's business, forcing MMA to take action to avoid additional and irreparable damage to its business.

2.     Lockton, a competitor long notorious for building itself on the backs of rivals, recruited Christenson—a key MMA insider—explicitly to attempt to hollow out MMA's Minneapolis business by first poaching critical personnel and then stealing MMA's clients.

3.      Lockton's conduct is nothing less than a calculated corporate raid on MMA, its related entities, officers, employees, and clients, accomplished through a coordinated campaign to engineer a targeted exodus of key personnel from multiple MMA offices in key geographies where Lockton's footprint was previously lacking, including Minneapolis Minnesota.[1]

4.      In the wake of Christenson's departure, MMA Minneapolis steadily lost six additional employees—each loss following Christenson's move to Lockton and noncoincidental. Upon information and belief, Christenson unlawfully and methodically, with Lockton's knowledge, support and encouragement, recruited all seven—Erik Steiner ("Steiner"), Brock Wheeler ("Wheeler"), Archie Skalbeck ("Skalbeck"), Heidi Hagemeyer ("Hagemeyer"), Blake Hoffarber ("Hoffarber"), and Sam Bougie ("Bougie") (collectively with Christenson, the "Former MMA Employees").

5.      Some of the Former MMA Employees—most notably Hoffarber—were responsible for originating client business for MMA, relationships Christenson understood were highly valuable to Lockton if they could induce those clients to follow Christenson to Lockton, despite Christenson's and the other Former MMA Employees' contractual restraints that prohibited

---

[1] *See Willis Towers Watson CAC, Inc. v. Matta,* No. 21-cv-23036 (S.D. Fla. 2021); *Arthur J. Gallagher & Co. v. Filewicz,* No. 21-cv-522 (E.D. Pa. 2021); *McGriff Insurance Services v. Brand Ainsworth, et al*, 01-CV-2021-900854 (Ala. Cir. Ct., Jefferson Cnty. 2021); *Mark Edwards Partnes LLC v. Cosgrove,* 20-cv-3766 (LTS)(SLC) (S.D.N.Y. 2020); *Willis Re Inc. v. Littlel,* No. 19-cv-9087 (VEC) (S.D.N.Y. 2019); *Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326 (S.D.N.Y. 2018); *USI Ins. Servs. Nat'l, Inc. v. Lockton Cos.*, LLC, No. 18-cv-00158 (N.D. Ill. 2018); *USI Ins. Servs. Nat'l, Inc. v. Lockton Cos.*, LLC, No. 17-cv-02711 (D. Kansas 2017); *USI Ins. Servs., LLC v. Lockton Cos., LLC,* No. 17-cv-09946 (JMF) (S.D.N.Y. 2017); *USI Ins. Servs., LLC v. Lockton Cos.*, LLC, No. 17-cv-09948(RA) (S.D.N.Y. 2017); *USI Ins. Servs. Nat'l, Inc. v. Lockton Cos.*, *LLC*, No. 17-cv-02895 (M.D. Fla. 2017); *USI Ins. Servs., LLC v. Lockton-Dunning Series of Lockton Cos., LLC,* No. 17-cv-03389-M (N.D. Tex. 2017); *USI Ins. Servs. Nat'l Inc. v. Lockton Cos., LLC*, No. 17-cv-01842 (W.D. Wash. 2017); *Wells Fargo Ins. Servs. USA, Inc. v. Galioto*, No. 17-cv-04588 (D. Minn. 2017); *Willis of Seattle Inc. v. Walton*, No. 17-2-08461-1 (Wash. Superior Ct., King Cnty. 2017); *Tompkins Ins. Agencies, Inc. v. Sumner*, No. CV 16-2217, 2016 WL 3345452, at *1 (E.D. Pa. June 15, 2016); *Graham Co. v. Keith*, No. 14-cv-06128 (E.D. Pa. 2014); *Marsh & McLennan Agency LLC v. Houstoun*, Index No. 651521/2012 (N.Y. Sup. Ct., N.Y. Cnty. 2012); *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 766 (Tex. 2011); *Willis Grp. Holdings Public Ltd Co. v. Cummings*, Index No. 652603/2011 (N.Y. Sup. Ct., N.Y. Cnty. 2011); *Aon Corp. v. Haskins*, No. 09-cv-03531 (D. Minn. 2009); *Palmer & Cay of Ga., Inc. v. Lockton Cos., Inc.*, 280 Ga. 479, 479, 629 S.E.2d 800, 801 (2006).

them from both soliciting and servicing those MMA clients.  Indeed, it is almost impossible for the Former MMA Employees to successfully solicit and service those clients without necessarily relying upon the confidential and proprietary information they learned during their employment with MMA.

6.    Others, including Defendant Hagemeyer, provided day-to-day servicing of MMA clients, including those clients tied to Christenson and Hoffarber at MMA.  Christenson and Lockton both knew that the scheme to steal clients depended on transferring the servicing team to Lockton, thereby allowing Lockton to assure MMA clients of a seamless transition from MMA to Lockton.

7.    That unlawful scheme, hatched and executed by Christenson and Lockton, has already cost MMA at least three clients and recurring annual revenue of almost half a million dollars.  The threat is ongoing, and MMA faces the prospect of substantially greater losses unless this predatory conduct is halted.

8.    This Court should recognize the Defendants' unlawful scheme and bring it to a halt and award the compensation justly owed to MMA for their actions.

## THE PARTIES

9.     MMA is a Delaware limited liability company with its principal place of business located at 360 Hamilton Avenue, Suite 930, White Plains, New York 10601.  It is a leader in insurance and employee benefits brokerage and managements services.

10.    MMA's sole member is Marsh USA LLC ("Marsh Risk"), a Delaware corporation with its principal place of business located at 1166 Avenue of the Americas, New York, New York 10036.

3

11.     Both MMA and Marsh Risk are subsidiaries of Marsh & McLennan Companies, Inc., ("Marsh"), a Delaware corporation with its principal place of business located at 1166 Avenue of the Americas, New York, New York 10036.

12.     Defendant Steve Christenson is an adult individual whose permanent home and residence is, upon information and belief, 3715 Glendale Terrace, Minneapolis, Minnesota 55410. Christenson was Senior Vice President of National Accounts for MMA.  On October 8, 2024, he resigned to work for Lockton, upon information and belief, as Senior Vice President, Property and Casualty Leader of Lockton's Minneapolis office.

13.     Defendant Heidi Hagemeyer is an adult individual whose permanent home and residence is, upon information and belief, 8698 Black Maple Drive, Eden Prairie, Minnesota 55344.  Hagemeyer was Vice President, Client Director for MMA.  On November 10, 2025, Hagemeyer resigned to work for Lockton, upon information and belief, as Vice President, Senior Account Executive, Property & Casualty, in Lockton's Minneapolis office.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over this action under 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.  MMA is a citizen of Delaware and New York.  Defendants Christenson and Hagemeyer are domiciled in Minnesota and therefore citizens of Minnesota.

15.     By signing and accepting the terms of their binding agreements with MMA, all Defendants expressly agreed to this Court's jurisdiction over this action and of personal jurisdiction over them.  Each agreement specifically states the following:

> The parties, being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action or proceeding with respect to this Agreement and Employee's employment shall be brought exclusively in the Civil Court of the City of New York, New

4

> York County, or in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York, or in any other court of competent jurisdiction in or for the State and County of New York, and the parties agree to the personal jurisdiction thereof.

16. Defendants are all subject to personal jurisdiction in New York given that they engaged in intentional and tortious conduct directed at MMA, knowing it is located in New York, and calculated to harm MMA in New York. MMA, whose principal place of business is New York, is damaged and continues to be damaged by Defendants' conduct in New York.

17. This Court also has specific personal jurisdiction over each of the Defendants because they regularly conduct business in the State of New York, including with MMA, which maintains its primary place of business in New York.

18. Venue is also proper in this District because MMA maintains its principal place of business in this District and a substantial part of the events or omissions giving rise to MMA's claims occurred here: (1) the contracts Defendants are breaching were negotiated in New York; (2) Defendants owed duties to their New York-based employer; (3) MMA learned of the breaches in New York; (4) MMA was harmed and continues to face the risk of additional immediate harm in New York as it deals with the operational and financial impact of the resignations; and (5) MMA maintains some of the Confidential Information and Trade Secrets (as defined in Schedule 1 to the Marsh USA Confidentiality Agreement, hereinafter the "Confidential Information") relevant to its claims in this action in New York—including business records that form a basis for MMA's claims.

19. New York law applies to the claims against Defendants pursuant to the terms of their agreements with MMA.

**FACTUAL BACKGROUND**

20.    MMA serves middle market and large corporate clients with a broad range of commercial property and casualty products and services, as well as solutions for employee health and benefits, retirement and administration needs, and a growing personal lines business in the United States and Canada.  MMA also provides advice on insurance program structure and market dynamics, along with industry expertise and transactional capability.

21.    MMA employees have access to and rely upon the confidential and proprietary information and/or trade secrets of MMA and its affiliates to provide these services.

22.    Over the years, MMA has invested significant time, millions of dollars, and goodwill building a robust insurance brokerage business within Minnesota and the rest of the United States.

23.    All the Former Employees, including Christenson and Hagemeyer, had access to MMA's Confidential Information.  As Senior Vice President, National Accounts for MMA, Christenson had access at the highest levels to the most sensitive Confidential Information, including Confidential Information related to MMA's strategic business initiatives and compensation related to the Former Employees.

24.    MMA protects its Confidential Information, including by requiring employees to execute Confidentiality Agreements that define MMA's Confidential Information (which includes clients' confidential information) and describe employees' obligations to safeguard it.

25.    This commercially sensitive Confidential Information is vital to MMA's collective success and its employees' individual success, as information about prospective clients, competitive pricing, and growth opportunities are of paramount importance in this highly competitive industry.  Such detailed, proprietary information provides MMA and its employees

with significant competitive advantages.  MMA went to great lengths at enormous expense to collect and refine this information to benefit its business relative to its competitors, giving it a strong competitive advantage.  This information is not generally known to the public or readily ascertainable.

### MMA Protected its Legitimate Business Interests With Reasonable Restrictive Covenants that the Former Employees Freely and Voluntarily Entered

26.     It is common in the competitive insurance brokerage and risk management industries, and related consulting services, to require top employees to execute restrictive covenants as terms and conditions of employment.

27.     As a condition of each of the Former Employees' employment with MMA, they each executed binding and enforceable restrictive covenant agreements with MMA in order to protect MMA's legitimate business interests.

28.     Because of its position in the industry and prior engagements with MMA and Marsh, Lockton is aware of MMA's restrictive covenant obligations and practices, which are substantially similar to Lockton's own.

29.     MMA's restrictive covenants are each narrowly tailored to protect MMA's legitimate business interests.

30.     MMA has a reputation for expertise in the insurance industry and has developed, through great expense, significant goodwill embodied in MMA's relationships with its clients and the insurance companies whose products are sought by MMA's clients.

31.     The prohibitions on directly or indirectly soliciting, servicing or otherwise interfering with certain clients and prospective clients protects MMA's legitimate interest in its client relationships in which it is significantly invested.

32.     MMA also has a legitimate interest in maintaining its relationship with its employees, in whom MMA invest significant capital to train and retain.

33.     The prohibitions on directly or indirectly soliciting certain MMA employees to induce them to resign their employment with MMA protects MMA's legitimate interest in its employment relationships in which it is significantly invested.

34.     MMA also has an interest in prohibiting its employees, to whom it entrusted Confidential Information, from disclosing and using its confidential information to lure customers and employees away from MMA.

35.     Because the insurance marketplace is a competitive industry, much of the information about MMA's business plans, products, services, employees, and clients is considered by MMA to be Confidential Information.  MMA has developed and marketed an operation that is highly dependent upon maintaining the secrecy of this information.

36.     Disclosing this confidential information would put MMA at a competitive disadvantage, as this information is only valuable if MMA can maintain its secrecy.

**Defendant Christenson Joins MMA and Contractually Accepts Post-Employment Obligations to Protect MMA's Legitimate Business Interests and Confidential Information**

37.     In July 2018, Christenson began employment as Senior Vice President,  National Accounts for MMA, in which capacity he served until October 2024.   In his capacity leading the marketing operations of MMA's National Accounts team, Christenson focused on client acquisition and retention.

38.     Upon information and belief, Christenson is performing the same or similar services that he performed at MMA but is now performing on behalf of Lockton and in competition against MMA.  As reflected in Christenson's LinkedIn profile, Christenson leads Lockton's

Property & Casualty team and is responsible for the acquisition and retention of clients for Lockton's benefit. In other words, Christenson performs the exact same client-facing role he performed during his employment at MMA. This means that any interaction Christenson has with clients he serviced or about which he learned confidential information during his employment with MMA creates a substantial and intolerable risk to MMA's customer goodwill, trade secrets, and confidential information.

39.    In connection with, and as a condition of his employment, Christenson signed a Non-Solicitation and Confidentiality Agreement (the "Christenson NSA") with MMA. A copy of the Christenson NSA is attached as **Exhibit A**.

40.    By signing the Christenson NSA, Christenson agreed, for a period of two years following the end of his employment, that he would not, directly or indirectly: (i) solicit clients or prospective clients of MMA for the purpose of selling or providing products or services of the type sold or provided by Employee while employed by MMA; (ii) induce clients or prospective clients of MMA to terminate, cancel, not renew, or not place business with MMA; (iii) perform or supervise the provision or performance of services or projects or provision of products of the type sold or provided by Employee while he or she was employed by MMA on behalf of any clients or prospective clients of MMA; or (iv) assist others to do the foregoing acts. Exhibit A, ¶ 1(b).

41.    Christenson also agreed that, both during his employment with MMA and for a period of two (2) years thereafter, he would not, either on his own account or on behalf of any person, company, or other entity, directly or indirectly, solicit, or endeavor to cause any MMA employee to leave his or her employment with MMA. Exhibit A, ¶ 2.

42.    By signing the Christenson NSA, Christenson also agreed that, for so long thereafter as the pertinent information or documentation remains confidential, he would not, for

any purpose whatsoever, directly or indirectly use, disseminate or disclose to any other person, organization or entity, Confidential Information or Trade Secrets, except as required to carry out his duties as an employee of MMA.  Exhibit A, ¶ 5(a).

43.     The Christenson NSA is governed by and construed in accordance with the laws of State of New York.  Exhibit A, ¶ 15.

**Defendant Hagemeyer Joins MMA and Contractually Accepts Post-Employment Obligations to Protect MMA's Legitimate Business Interests and Confidential Information**

44.     In May 2015, Hagemeyer began her employment at MMA as a Client Advisor. Hagemeyer remained in that role until January 2018, when she was promoted to the position of Vice President, Client Director.  Hagemeyer held this position until she resigned from MMA to join Lockton in or about November 2025.

45.     Upon information and belief, Hagemeyer is performing the same or similar services that she performed at MMA as a Client Director, except that she now holds the title of Senior Account Executive.  Hagemeyer's duties as Senior Account Executive for Lockton put her in direct competition with MMA.  As reflected in Hagemeyer's LinkedIn profile, Hagemeyer, who is currently a member of Lockton's Property & Casualty team, claims to bring expertise and "deep technical knowledge" gained from her previous employ, i.e., approximately a decade at MMA.

46.     In connection with, and as a condition of her employment, Hagemeyer signed a Non-Solicitation and Confidentiality Agreement (the "Hagemeyer NSA") with MMA.  A copy of the Hagemeyer NSA is attached as **Exhibit B**.

47.     By signing the Hagemeyer NSA, Hagemeyer agreed, for a period of two years following the end of her employment, that she would not, directly or indirectly: (i) solicit clients or prospective clients of MMA for the purpose of selling or providing products or services of the type sold or provided by Employee while employed by MMA; (ii) induce clients or prospective

clients of MMA to terminate, cancel, not renew, or not place business with MMA; (iii) perform or supervise the provision or performance of services or projects or provision of products of the type sold or provided by Employee while he or she was employed by MMA on behalf of any clients or prospective clients of MMA; or (iv) assist others to do the foregoing acts.  Exhibit B, ¶ 1(b).

48.     Hagemeyer also agreed that, both during employment with MMA and for a period of two (2) years thereafter, she would not, either on her own account or on behalf of any person, company, or other entity, directly or indirectly, solicit, or endeavor to cause any employee of MMA to leave employment with MMA.  Exhibit B, ¶ 2.

49.     By signing the Hagemeyer NSA, Hagemeyer also agreed that, for so long thereafter as the pertinent information or documentation remains confidential, she would not, for any purpose whatsoever, directly or indirectly use, disseminate or disclose to any other person, organization or entity Confidential Information or Trade Secrets, except as required to carry out her duties as an employee of MMA.  Exhibit B, ¶ 5(a).

50.     The Hagemeyer NSA is governed by and construed in accordance with the laws of State of New York.  Exhibit B, ¶ 15.

**Christenson Methodically Poaches MMA Employees Who Join Lockton**

51.     On October 8, 2024, Christenson resigned from his employment with MMA.  On LinkedIn, Lockton posted an announcement of him joining them, stating, "With more than two decades of industry expertise, Steve will guide strategy and new business in Minneapolis."

52.     It soon became clear that Christenson's strategy to grow Lockton's business in Minneapolis was to recruit key talent and clients away from MMA in violation of his and the Former Employees' contractual obligations.

11

53.    In a press release, dated March 3, 2026, Lockton described Christenson as "a single strategic hire," whose hiring "developed into a focused expansion of talent and capabilities" of Lockton's Risk Solutions team.

54.    Lockton specifically identified Christenson's hiring as the "momentum" behind the Minneapolis office's recent "significant period of growth." According to Lockton, "With Christenson in place, the Minneapolis office began attracting top talent. . . ." as part of a "coordinated effort to build" Lockton's Risk Solutions practice.  Lockton also acknowledged that the Minneapolis Risk Solutions practice "quickly shifted from steady growth to intentional, accelerated expansion[,]" which has included the hiring of the Former Employees.

55.    Christenson recruited MMA employees deliberately and methodically.  Merely a few months following Christenson's resignation, Steiner resigned from MMA February 10, 2025 and joined Lockton.  Wheeler resigned from MMA on March 14, 2025 and joined Lockton. Skalbeck resigned on March 31, 2025 and joined Lockton.  Hagemeyer resigned on November 10, 2025 and joined Lockton.  Hoffarber resigned on December 19, 2025 and joined Lockton.

56.    Upon information and belief, Christenson was the architect of Lockton's strategy of  targeted recruitment of Skalbeck, Hagemeyer, Hoffarber, Bougie and other MMA employees. This was all part of Lockton's and Christenson's orchestrated scheme intended to cripple MMA's business and operations in Minnesota, paving the way for Lockton to unfairly compete and steal the business and customer goodwill that MMA had invested significant financial and other resources to cultivate and maintain.

57.    With full-service teams now at Lockton, it was time for Christenson to bring in some client business.  Upon information and belief, having moved the former MMA day-to-day servicing team to Lockton, Christenson was now in a position to persuade key MMA clients to

transition their business from Lockton to MMA without disrupting service.  The key to this strategy was Lockton's and Christenson's recruitment of not only MMA's business generators, but the members of the MMA team that serviced the customer accounts.  By recruiting the team that had primarily supported Hoffarber's accounts, Christenson had the leverage to persuade Hoffarber to join Lockton because the MMA clients with whom he had a relationship were more easily enticed to move business to Lockton to retain the same service team.

58.    Upon information and belief, as part of the raid on MMA conducted by Defendants, Christenson helped Lockton identify, recruit and hire MMA's employees and encouraged MMA employees to leave MMA and join Lockton and coordinated their departures, in violation of their legal obligations to MMA.  Again, the recruitment of MMAs' business development and servicing teams made it far easier for Lockton to then steal the same client relationships that these teams serviced and with whom they did business while employed by MMA, using the customer goodwill and confidential information that they were handsomely compensated by MMA to cultivate on MMA's behalf.

59.    Given his senior level position, Christenson was equipped with full knowledge of the Former Employees' salaries, bonuses and benefit information and were therefore able to offer competitive terms of employment with Lockton in order to induce them to leave their positions at MMA in favor of Lockton.  Hagemeyer, among other Former Employees, devoted her time at MMA to the execution of client needs and relationship management, largely with clients that were tied to Christenson and Hoffarber at MMA.

60.    Defendants are in a position to leverage their prior experience at MMA to violate the restrictive covenants at Lockton by, for example, soliciting business, soliciting or assisting in

the solicitation of products or services the individual worked on at MMA, and soliciting MMA's talent pool.

61.     As Producers, Christenson and Hoffarber were each lead representative on MMA's deals and sales initiatives and chief point of contact with clients and prospective clients.  In that capacity, Christenson and Hoffarber were each responsible for cultivating client and prospective client relationships and converting them into sales of MMA's products and services.

62.     At MMA, Christenson and Hoffarber were each a primary source of growing relationships and for educating MMA employees about what MMA has to offer and how to position MMA's products to clients and prospective clients (which, upon information and belief, Christenson and Hoffarber are now doing on behalf of Lockton and in competition against MMA).

63.     By virtue of their employment at MMA, Christenson and Hoffarber each had access to and was intimately familiar with MMA's clients and prospective clients, including their deal terms, requirements, and pricing sensitivities.

64.     As such, Christenson and Hoffarber has knowledge concerning MMA's business opportunities, what clients and prospective clients want, and who to target for MMA's products – which information, upon information,  Defendants are now using for Lockton's benefit and to MMA's detriment.

65.      Additionally, in their capacity as service team members for client accounts throughout the Former Employees' employment, each person was intimately involved in and had knowledge of MMA's relationships and transactions with clients and prospective clients and marketing and sales strategies to advance MMA's products and services.

66.     Because the Former Employees now at Lockton are each performing a similar position as he or she held at MMA, or are providing similar services of products—including those

14

against which he or she used to compete on behalf of MMA—the Former Employees are well positioned to leverage his or her relationship with those clients and prospective clients to encourage them to prioritize or promote Lockton over MMA.

**Defendants Breach Restrictive Covenants; MMA Loses Three Clients**

67. On November 5, 2024, MMA's internal legal counsel wrote to Christenson and Lockton to remind Christenson of his legal obligations to MMA.

68. On February 15, 2025, following Steiner's resignation, MMA's internal legal counsel wrote to Lockton expressing concern that Christenson may be soliciting MMA colleagues, including Steiner. MMA's internal counsel also notified Lockton that other MMA employees had informed MMA that Christenson was meeting with MMA colleagues and telling them that he was looking to hire Producers and a property broker.

69. For months, the Former Employees built up the team at Lockton while lying in wait.

70. Unfortunately, MMA recently discovered the Former Employees were merely laying the groundwork for substantial client and prospective opportunity loss and associated damages to MMA's business.

71. Upon information and belief, the Former Employees were and/or have been acting under the direction or supervision of Christenson who, as Lockton's newly appointed leader of the Minneapolis Property & Casualty team, was responsible for building a team to expand Lockton's presence in the marketplace.

72. Upon information and belief, at MMA, Christenson worked with all of the Former Employees and the Former Employees each supported clients tied to Christenson and/or MMA.

73. On March 31, 2026, several months after Hagemeyer's resignation from MMA, Client A notified MMA that it was moving its business to Lockton. The Broker of Record letter,

evidencing the change of broker from MMA to Lockton, was directed to Hagemeyer at MMA as she regularly managed the account when she was employed at MMA.  Hagemeyer also received commission on the account over the past two years preceding her resignation from MMA and employment with Lockton.

74.    Upon information and belief, Hagemeyer directly or indirectly through others, including, but not limited to the Former Employees, solicited Client A to move its business from MMA to Lockton.

75.    Additionally, Christenson, Skalbeck, and Bougie, who similarly resigned and are now working with Hagemeyer at Lockton, also serviced Client A during their employment at MMA when Hagemeyer managed Client A's account.  Skalbeck also received commission on the account during his employment with MMA.

76.    Almost twenty-five (25) percent of the team that serviced Client A on behalf of MMA in the preceding year are now employed at Lockton.

77.    Upon information and belief, Hagemeyer and Christenson are each performing or supervising the provision or performance of services or products of the type that he or she sold or provided during his or her employment with MMA and/or are assisting others to do so.

78.    On March 30, 2026, Client B notified MMA that it was moving its business to Lockton.  Christenson was responsible for producing and providing services to Client B at MMA. Shortly before receiving notice of Client B's intent to move its business, a MMA employee witnessed Christenson having breakfast with a key decisionmaker at Client B.

79.    Upon information and belief, Christenson directly or indirectly solicited Client B to move its business from MMA to Lockton.

16

80.    Before Client B moved its business from MMA to Lockton, in addition to Christenson, Hoffarber, Skalbeck and Steiner also serviced Client B at MMA.  Like Christenson, Hoffarber, Skalbeck and Steiner also received commission for work done on the account during their employment with MMA.

81.    Approximately twenty-five (25) percent of the team that serviced Client B on behalf of MMA in the preceding year are now employed at Lockton.

82.    MMA has since learned that, upon information and belief, both Christenson and Hagemeyer, among other Former Employees, are providing services to Client B at Lockton, in violation of their obligations to MMA.

83.    On May 21, 2026, Client C notified MMA that it was moving its business.  Client C's relationship at MMA was managed by Christenson.  MMA later learned that Client C moved its business to Lockton.  Christenson was MMA Producer tied to Client C, with day-to-day service provided by Hagemeyer.

84.    Skalbeck and Steiner also serviced the Client C account at MMA.

85.    Christenson, Hagemeyer and Skalbeck each received compensation from MMA for their work on the Client C account.

86.    Thirty (30) percent of the team that serviced Client C on behalf of MMA in the preceding year are now employed at Lockton.

87.    Client C confirmed to MMA that they were moving to Lockton because of Christenson and Hagemeyer, stating they "simply wanted their service team back."  As such, upon information and belief, Christenson and Hagemeyer are, or will be, providing or supervising the provision of services or products of the type that they provided while employed by MMA.

88.     Defendants' ongoing assault on MMA's business has caused, is continuing to cause, and threatens to cause, immediate, irreparable harm to MMA by, among other things, impairing MMA's goodwill and reputation with its clients, destroying MMA's established client relationships that it has invested time and resources to cultivate and maintain, destroying MMA's employee relationships, disrupting the continuity of MMA's workforce, and threatening the continued disclosure, misuse, and misappropriation of its trade secret, confidential and proprietary business information.

89.     Christenson and Lockton's scheme has harmed and continues to harm MMA.  This scheme was executed by both targeting MMA clients who, upon information and belief, Defendants solicited in violation of their restrictive covenant obligations owed to MMA, as well raiding MMA Minneapolis by soliciting MMA employees in violation of Defendants' non-solicitation and confidentiality agreements with MMA.

90.     The Former Employees present a serious threat to MMA's clients, key employees, and valuable confidential information.  These efforts are underway, ongoing, and continuous. MMA is entitled to compensation because of harm directly and proximately caused by Defendants' conduct to date.

### AS AND FOR A FIRST CAUSE OF ACTION
***Breach of NSA Agreement – Non-Solicitation of Customers***
(Against all Defendants)

91.     MMA repeats and realleges every allegation in Paragraphs 1 through 90 as if set forth herein.

92.     The customer and prospective customer non-solicitation and non-servicing provisions of the NSA Agreements are valid and enforceable.

93.     MMA fully performed its obligations under the NSA Agreements.

94.    Under the NSA Agreement, Defendants are prohibited, for two years following their separation of employment with MMA, from directly or indirectly, (i) soliciting clients or prospective clients of MMA for the purpose of selling or providing products or services of the type sold or provided by them while employed by MMA; (ii) inducing clients or prospective clients of MMA to terminate, cancel, not renew, or not place business with MMA; (iii) performing or supervising the provision or performance of services or projects or provision of products of the type sold or provided by them while he or she was employed by MMA on behalf of any clients or prospective clients of MMA; or (iv) assisting others to do the acts.

95.    Defendants breached their respective NSA Agreements by soliciting at least three MMA clients with the intention of causing those clients and prospective client to transfer their business from MMA to Lockton.

96.    Defendants, upon information and belief, also breached their respective NSA Agreements by servicing and/or supervising the servicing of former MMA clients they had provided services or products during their employment with MMA, which they are now doing in competition against MMA on behalf of Lockton.

97.    As a direct and proximate result of Defendants' breach, MMA has suffered and will continue to suffer irreparable injury, loss of goodwill, harm to its business, and other damages, including lost revenue, attorneys' fees, and litigation costs in an amount to be proven at trial.

### AS AND FOR A SECOND CAUSE OF ACTION
*Breach of NSA Agreement – Non-solicitation of Employees*
(Against Defendant Christenson)

98.    MMA repeats and realleges each and every allegation in Paragraphs 1 through 97 as if set forth herein.

99.     The employee non-solicitation provisions of the NSA Agreements are valid and enforceable.

100.    MMA fully performed its obligations under the NSA Agreements.

101.    Under the NSA Agreement, Defendants are prohibited, for two years following their separation of employment with MMA, either on their own account or on behalf of any person, company, corporation, or other entity, directly or indirectly, from soliciting, or endeavor to cause any employee of MMA to leave employment with MMA.

102.    Upon information and belief, Christenson has solicited MMA employees in violation of the non-solicitation provision of the NSA.

103.    As direct and proximate result of the Christenson's breaches of his non-solicitation agreement, MMA has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.

**AS AND FOR A THIRD CAUSE OF ACTION**
*Tortious Interference with Contract*
(Against Defendant Christenson)

104.    MMA repeats and realleges each and every allegation in Paragraphs 1 through 103 as if set forth herein

105.    Plaintiff MMA and Defendant Christenson entered into the Christenson NSA.  The Christenson NSA is a valid and enforceable contract between MMA and Christenson.  Christenson agreed, for a period of two years following his separation of employment from MMA, to refrain from soliciting MMA's clients and employees, from providing or supervising the provision of services or products of the type sold or provided while he was employed by MMA on behalf of

any clients or prospective clients of MMA, and to refrain from assisting others from doing the foregoing acts.

106.    Defendant Christenson knew that other Former MMA Employees executed similar agreements with MMA.

107.    Despite his knowledge, Defendant Christenson, upon information and belief, using improper motives and means, intentionally encouraged and assisted other Former MMA Employees in breaching their contractual obligations, including providing or supervising the provision of services or products of the type sold or provided by the Former MMA Employees while he or she was employed by MMA.  By doing so, Defendant Christenson has interfered with the agreements between MMA and Former MMA Employees.

108.    Defendant Christenson's conduct, as detailed herein, is part of an unjustifiable and improper business strategy by Christenson and Lockton to gain market share in the Minneapolis market through predatory raids rather than legitimate competition.  Lockton has been repeatedly sued for engaging in substantially similar schemes involving Lockton's corporate raid of its competitors procuring employee resignations, inducing breaches of restrictive covenants, and leveraging confidential information procured through the hiring of competitors' key personnel to solicit clients and prospective clients of Lockton's competitors.  Lockton's conduct, here and elsewhere, evidence a consistent pattern by Lockton attempting to cripple competitors through sabotage and unfair competition.

109.    Defendant Christenson's tortious interference has damaged MMA and will likely irreparably harm MMA if Defendant Christenson's conduct is allowed to continue, including the loss of business opportunities MMA hired and paid Defendant Christenson and Former MMA Employees to maintain and develop, to the benefit of Lockton, MMA's direct competitor.

110.    As direct and proximate result of the Christenson's breaches of the Christenson NSA, MMA has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.

**AS AND FOR A FOURTH CAUSE OF ACTION**
*Tortious Interference with Existing and Prospective Business Relationships*
(Against Defendant Christenson)

111.    MMA repeats and realleges each and every allegation in Paragraphs 1 through 110 as if set forth herein.

112.    As a result of his employment with MMA, Defendant Christenson was intimately familiar with, and had detailed knowledge concerning, the business relationships that existed between MMA and its clients.

113.    Upon information and belief, Defendant Christenson intentionally, with malice, and without privilege or justification, interfered with MMA's business relationships with certain clients using unfair or improper means, and/or with the intent to interfere with such relationships, by soliciting directly or indirectly soliciting and/or diverting certain of MMA's clients to Lockton.

114.    Defendant Christenson had actual notice of his post-employment obligations under the Christenson NSA, which restricted him from soliciting MMA's clients and employees for a period of two years following his separation of employment from MMA.

115.    MMA possesses a protectable interest in its contracts and relations with its clients, in that it has a reasonable expectation of their continued association with MMA.

116.    Defendant Christenson's conduct was undertaken with malice, or in knowing disregard of or indifference to, the rights and interests of MMA.

117.    As a direct and proximate result of Defendant Christenson's interference, MMA has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.

**WHEREFORE**, Plaintiff respectfully requests that judgment be made and entered against Defendants and in favor of Plaintiff as follows:

(a)     Finding that each Non-Solicitation and Confidentiality Agreement signed by the Defendants is valid and enforceable.

(b)     Enjoining and restraining Defendants, and any person or entity acting in concert with them, for a period of 24 months following their terminations from employment with MMA, and as extended during any period that Defendants have breached their obligations to Plaintiff, from directly or indirectly diverting, taking away or doing business with clients or prospective clients with whom they had any direct or indirect involvement during the 24 months immediately prior to their terminations from employment.

(c)     Enjoining and restraining Defendants, and any person or entity acting in concert with them, for a period of 24 months following their terminations from employment with MMA, and as extended during any period that Defendants have breached their obligations to Plaintiff, from directly or indirectly, soliciting, inducing, recruiting or making an offer of employment to any of Plaintiff's employees who were employed at any time during the 24 months prior to Defendants' terminations from employment and with whom the Defendant had any direct or indirect involvement during the course of their employment with MMA.

(d)     Enjoining and restraining Defendants, and any person or entity acting in concert with them, from any other actions in violation of any Defendants' contractual obligations or fiduciary duties owed to Plaintiff;

(e)    Awarding compensatory damages and interest to Plaintiff in an amount to be determined at trial;

(f)    Awarding exemplary and punitive damages; and

(g)    Granting Plaintiff its costs and disbursements incurred in connection with this litigation, including attorneys' fees, together with such other further relief as the Court may deem just and proper.

Dated: June 9, 2026
      New York, New York

          /s/ *A. Michael Weber*
          A. Michael Weber
          Gary Moy
          LITTLER MENDELSON, P.C.
          900 Third Avenue
          New York, NY 10022
          (212) 583-9600
          mweber@littler.com
          gmoy@littler.com

          Jeremy Sosna (admission *pro hac vice* pending)
          LITTLER MENDELSON, P.C.
          1300 IDS Center
          80 South 8th St
          Minneapolis, MN 55402
          (612) 313-7606
          jsosna@littler.com

          *Attorneys for Plaintiff*